UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JOHN GABOR, et al., <br><br> Plaintiffs, <br><br> v. <br><br> MIRIAM CARTER DESHLER, et al., <br><br> Defendants. | Case No. 17-CV-01524-LHK <br><br> **ORDER DENYING WITHOUT PREJUDICE MOTION FOR DEFAULT JUDGMENT, GRANTING LEAVE TO AMEND** <br><br> Re: Dkt. No. 83 |

Plaintiffs John and Kay Gabor ("Plaintiffs") move for default judgment against Defendants Rebecca Harris and Kristin Humphrey ("Harris" and "Humphrey"). ECF No. 83. Having considered Plaintiffs' motion, the relevant law, and the record in this case, the Court DENIES without prejudice Plaintiffs' motion for default judgment. The Court GRANTS Plaintiffs' request for leave to file an amended complaint, subject to the limitations identified in this order.

I.     **BACKGROUND**

A.     **Factual Background**

Plaintiff John Gabor ("John"), an 86-year-old resident of Campbell, California, served in the United States Air Force between 1950 and 1953, then worked as a professional wrestler until

1

1973.  ECF No. 1 at ¶ 1 ("Compl.").  After 1973, he worked as a long-haul trucker and a car dealer.  *Id.*  Plaintiff Kay Gabor ("Kay"), a 78-year-old resident of Campbell, California, worked in breeding, selling, and showing dogs.  *Id.* ¶ 2.

Defendant Miriam Carter Deshler, a citizen of Washington State, was a principal at Lord & Carter Trust and Trustee Services, which is also alleged to be a citizen of Washington State.  *Id.* ¶ 3.  Defendant Humphrey, a citizen of Washington State, is Deshler's daughter.  *Id.* ¶ 5.  Defendant Harris, also a citizen of Washington State, worked as Deshler's assistant at Lord & Carter Trust and Trustee Services.  *Id.* ¶¶ 6, 9.  Humphrey and Harris are married.  *Id.* ¶ 7.

### 1. Establishment of the Blue Mountain Trust

Plaintiffs first met Deshler in 1989.  At that time, Deshler was teaching law classes and giving seminars, presumably about financial or estate planning, to the public out of an office in San Jose, California.  *Id.* ¶ 13.  In the early 1990s, Plaintiffs had a dispute with the California Board of Equalization related to the collection of taxes on a dog breeding business.  *Id.* ¶ 14.  Deshler recommended that Plaintiffs put their assets into a trust.  Throughout the 1990s Deshler helped Plaintiffs establish a series of trusts for their home, their cars, and other types of property.  *Id.*

In about January 2000, Kay opened a savings account at Wells Fargo.  *Id.* ¶ 15.  In 2000, Deshler established an irrevocable trust called the "Blue Mountain Trust."  *Id.* ¶ 16; *see also* ECF No. 83-1.  The Blue Mountain Trust had three trustees: both Plaintiffs and Deshler.  Compl. ¶ 16.  Plaintiffs allege that Deshler told them that "the trust cannot be broken and that the money is totally safe."  *Id.*  By 2005, Plaintiffs had deposited their life's savings, about $1.3 million, into the Blue Mountain Trust.  *Id.*

### 2. Establishment of Other Trusts; Withdrawals from the Blue Mountain Trust

On or about May 4, 2005, Deshler established the "Black Bear Storage Trust," naming herself as trustee.  *Id.* ¶ 19; *see* ECF No. 83-5.  On July 18, 2005, Deshler transferred property located at 15005 E. Broadway Avenue in Spokane, Washington, into the Black Bear Storage

Case No. 17-CV-01524-LHK
ORDER DENYING WITHOUT PREJUDICE MOTION FOR DEFAULT JUDGMENT, GRANTING LEAVE TO AMEND

United States District Court
Northern District of California

Trust.  Compl. ¶ 19.

On or about November 1, 2005, Deshler established the "Nebraska Hotel Historical Restoration Trust," naming herself as trustee.  *Id.* ¶ 20; *see also* ECF No. 83-7 (portion of Nebraska Hotel Historical Restoration Trust).  On December 7, 2005, the Nebraska Hotel Historical Restoration Trust bought the Nebraska Hotel, located at 5008, 5010, and 5012 North Market Street in Spokane, Washington.  Compl. ¶ 20.  Plaintiffs allege that Deshler used $170,000 from the Blue Mountain Trust to buy the Nebraska Hotel.  *Id.*  Plaintiffs allege that at an unspecified later time Deshler promised to put $200,000 back into the Blue Mountain Trust.  *Id.*  It is unclear from the Complaint whether she actually returned the $200,000.  *Compare id.* (alleging that the money was never returned) *with id.* ¶ 45 (suggesting that $200,000 had been paid back).

On February 10, 2010, without Plaintiffs' knowledge or consent, Deshler withdrew $1,319,126.79 of Plaintiffs' assets from the Blue Mountain Trust from the Sprague Branch of Wells Fargo Bank, located inside a Safeway supermarket in Spokane Valley, Washington.  *Id.* ¶ 21.  Deshler did so by filling out eight request forms and ordering fourteen cashier's checks, all payable to "CARTER DESHLER TRUSTEE."  Details of the cashier's checks at issue are:

- Cashier's Check No. 0185203171 in the amount of $50,000.00;
- Cashier's Check No. 0185203172 in the amount of $50,000.00;
- Cashier's Check No. 0185203173 in the amount of $50,000.00;
- Cashier's Check No. 0185203174 in the amount of $50,000.00;
- Cashier's Check No. 0185203175 in the amount of $50,000.00;
- Cashier's Check No. 0185203176 in the amount of $11,000.00;
- Cashier's Check No. 0185203177 in the amount of $11,004.81;
- Cashier's Check No. 0185203178 in the amount of $11,000.00;
- Cashier's Check No. 0185203179 in the amount of $71,796.45;
- Cashier's Check No. 0185203180 in the amount of $12,083.27;
- Cashier's Check No. 0185203181 in the amount of $18,124.90;

United States District Court
Northern District of California

3

- Cashier's Check No. 0185203182 in the amount of $30,208.17;

- Cashier's Check No. 0185201195 in the amount of $427,902.31;

- Cashier's Check No. 0185201196 in the amount of $427,902.31;

*Id.* Plaintiffs allege in the Complaint to have copies of these cashier's checks, *id.*, and filed the copies as exhibits to their motion for default judgment, *see* ECF No. 83-10.

Plaintiffs allege that Jane Folden, then the manager of the Wells Fargo Sprague Branch, helped Deshler withdraw the money from the Blue Mountain Trust. Compl. ¶ 22. Plaintiffs allege that Folden was familiar with Deshler and negligently allowed Deshler to withdraw the money from the Blue Mountain Trust despite Kay's repeated instructions to Deshler and Folden that all of the money in the Blue Mountain Trust was to stay in the Blue Mountain Trust. *Id.* ¶¶ 24-25.

Plaintiffs allege that beginning in November 2010, Deshler used the money from the Blue Mountain Trust as collateral for third-party loans and to buy real estate. *Id.* ¶ 27. Specifically, on November 30, 2010, Deshler deposited $1,281,055.96 into a Wells Fargo account entitled "Crystal Gallery Operating Account." *Id.* ¶ 28; ECF No. 83-11 (December 2010 statement for Crystal Gallery Trust Operating Account). Between December 6, 2010 and December 31, 2010, Deshler transferred $776,766.65 from the Crystal Gallery Operating Account to the "Paul Revere Financial Group Trust." Compl. ¶ 29; *see also* ECF No. 83-6 (portion of Paul Revere Financial Group Trust); ECF No. 83-13 (December 2010 statement for Paul Revere Financial Group Trust). In December 2010, Deshler named Harris as trustee for the Paul Revere Financial Group Trust. Compl. ¶ 30. On February 27, 2011, Deshler established the "Home Sanctuary Trust" and named Harris and Humphrey as trustees. *Id.* ¶ 31; ECF No. 83-14 (portion of Home Sanctuary Trust). The Home Sanctuary Trust later made an unsecured loan to Christopher and Carlee Barnes, of Long Beach, California. Compl. ¶ 31; *see also* ECF No. 91 (Declaration of Bryan Barnes). In June 2011, Deshler established the "Buckeye Property Trust" and used it to buy property located at 1530 West Buckeye in Spokane, Washington. Compl. ¶ 32; ECF No. 83-16 (portion of Buckeye Property Trust). Deshler named Harris and Humphrey as trustees of the Buckeye

4

Property Trust.  Compl. ¶ 32.  On August 24, 2011, Deshler established the "Chelen Trust" and used it to buy property located at 1823 W. Chelan Avenue in Spokane, Washington.  *Id.* ¶ 33; ECF No. 83-17 (portion of Chelan Trust).  Harris and Humphrey were once again named as trustees. Compl. ¶ 33.  Finally, in August 2011, Deshler established the "Perry Street Trust" and named Harris and Humphrey as trustees.  *Id.* ¶ 34; ECF No. 83-18 (portion of Perry Street Trust).

### 3. Plaintiffs Learn of Unauthorized Withdrawals, Attempt to Recover Money

Plaintiffs allege that they first learned of Deshler's unauthorized withdrawal of their savings from the Blue Mountain Trust in June 2012.  Specifically, on June 12, 2012, Deshler wrote to Plaintiffs to inform them that Deshler and Harris would be in the San Jose area for seminars and meetings on June 22 and 23, 2012.  Compl. ¶ 35; ECF No. 83-19 (email from Harris entitled "Lord & Carter Business Trip").  On June 22, 2012, Deshler and Harris met with Plaintiffs at Plaintiffs' home in Campbell, California.  Compl.  ¶ 36.  During this meeting, Deshler and Harris admitted to Plaintiffs that Deshler had taken the money from the Blue Mountain Trust and reinvested it in properties owned by the Paul Revere Financial Trust.  *Id.*  Deshler and Harris showed Plaintiffs a brochure titled "Paul Revere Investments June 2012" that included pictures of a hotel and houses.  *Id.*; *see also* ECF No. 83-22 (copy of Paul Revere Investments 2012). Plaintiffs allege that seeing this brochure was the first that they had learned of the investments made with their savings.  They allege that the withdrawal from the Blue Mountain Trust was done without permission, a contract, a trustee meeting, or a "minute order."  *Id.*

According to Plaintiffs, Deshler represented to Plaintiffs during this June 22, 2012 meeting that Plaintiffs would receive $6,500 each month from "Paul Revere Investments," but Plaintiffs claim that they never received any monthly payment.  *Id.*  When Plaintiffs questioned Deshler about the details of the property purchases, addresses, and related trusts, Deshler responded, "None of your business, the trusts are secure."  *Id.*  Plaintiffs demanded that their money be immediately returned to the Blue Mountain Trust, but Deshler and Harris told Plaintiffs that their money would be returned with interest in thirty years.  *Id.* ¶ 38.  On June 23, 2012, John attended

Case No. 17-CV-01524-LHK
ORDER DENYING WITHOUT PREJUDICE MOTION FOR DEFAULT JUDGMENT, GRANTING LEAVE TO AMEND

the seminar Deshler was giving and pulled Deshler aside to demand that she return the money to the Blue Mountain Trust. *Id.* ¶ 39. Deshler replied that she could return it in five years. *Id.*

In July and August 2012, John spent three weeks in Spokane, Washington, investigating Deshler's actions. *Id.* ¶ 40. With the help of a title researcher and property tracer, John located the properties identified in the Paul Revere Investments brochure and placed liens on those properties. *Id.* John also had three or four meetings with Deshler and Harris in Spokane about "the problems with the trust," but Deshler and Harris refused to cooperate. *Id.* ¶¶ 40, 42. In addition, John met with Patrick Devine, who was then manager of Wells Fargo's Sprague Branch. *Id.* ¶ 42. Devine allegedly commented about Deshler, "[T]here is something about her I don't trust. She's in here every day taking money in and out." *Id.* During a meeting that Devine arranged with Deshler and Harris, Deshler allegedly admitted taking the money from the Blue Mountain Trust without Plaintiffs' permission and commented, "You will have to put me in federal prison." *Id.* Devine initially helped John trace the money that Deshler withdrew from the Blue Mountain Trust and provided John "with some of the original legal paperwork," but after several weeks Devine said that he could no longer help. *Id.* ¶ 43.

Deshler allegedly threatened Plaintiffs during John's investigation in Spokane. Deshler called John and warned him that if he did not stop his investigation in Spokane, she would not be able to return any of Plaintiffs' money. *Id.* ¶ 44. Deshler also threatened "her own actions" if Plaintiffs persisted in asking questions about where their money had gone. Plaintiffs claim to have a recording of this voicemail, *id.*, and filed a transcription of the voicemail as an exhibit to their motion for default judgment, ECF No. 83-23.

On August 2, 2012, Deshler wrote a letter to Plaintiffs noting that she had returned $200,000 and that she could only pay back $20,000 more at that time. Compl. ¶ 45; ECF No. 83-24 (copy of letter). She proposed a payment plan of $4,000 per month to return that $20,000. *Id.*

Deshler died on September 30, 2012 and was cremated two days after her death. Compl. ¶ 46. Plaintiffs learned of Deshler's death when they received a letter from Harris, dated October

6

1    24, 2012, that informed them of Deshler's death. *Id.*; ECF No. 83-26 (copy of letter). Plaintiffs

2    then hired a private investigator to investigate which properties had been purchased with their

3    money and the status of the various Deeds of Trust. Compl. ¶ 47.

4         Plaintiffs allege that Deshler, Lord & Carter Trust and Trustee Services, Harris, and

5    Humphrey continue to perpetrate fraud on Plaintiffs by refusing to return Plaintiffs' assets that

6    were taken from the Blue Mountain Trust, concealing and misrepresenting information related to

7    the properties purchased with the Blue Mountain Trust funds, and continuing to collect rental

8    income from the properties purchased with the Blue Mountain Trust funds. *Id.* ¶ 48.

9         Plaintiffs allege that they tried to obtain information to resolve their claims by contacting

10    Wells Fargo headquarters in San Francisco, California in September and October 2015. *Id.* ¶ 49.

11    Wells Fargo has allegedly threatened to close Plaintiffs' accounts if they continue to raise this

12    issue with Wells Fargo. *Id.*

13 **B.**     **Procedural History**

14         Plaintiffs filed the complaint in this Court on March 21, 2017. ECF No. 1. Summonses

15    were returned executed as to Harris, Humphrey, and Lord & Carter Trust and Trustee Services on

16    April 17, 2017. ECF No. 6. On that same day, the summons was returned unexecuted as to

17    Deshler; the process server noted on the proof of service form that Deshler was deceased. ECF

18    No. 7. Wells Fargo filed a motion to dismiss on April 19, 2017, ECF No. 9, as did Harris and

19    Humphrey, ECF No. 12.

20         On May 1, 2017, the Court set a status conference for May 16, 2017 to discuss the non-

21    appearance of Deshler and Lord & Carter Trust and Trustee Service. ECF No. 18. In response to

22    the setting of the status conference, Harris and Humphrey's attorneys investigated the facts

23    surrounding the service of process on Deshler and Lord & Carter Trust and Trustee Services. *See*

24    ECF No. 19; ECF No. 25 at 3. On May 16, 2017, United States Magistrate Judge van Keulen held

25    a status conference on Deshler's and Lord & Carter Trust and Trustee Service's failure to appear.

26    ECF No. 29. At that status conference, Harris and Humphrey's attorney David Fisher explained

27

28    Case No. 17-CV-01524-LHK
     ORDER DENYING WITHOUT PREJUDICE MOTION FOR DEFAULT JUDGMENT, GRANTING LEAVE TO
     AMEND

1    that Deshler died on September 30, 2012. *See* Audio Recording of Status Conference at 9:37 a.m.

2    Plaintiff John Gabor acknowledged receipt of Deshler's death certificate. *Id.* at 9:48 a.m. Fisher

3    also explained that there is no such entity as Lord & Carter Trust and Trustee Services and that a

4    separate entity, Lord & Carter Trust, existed but ceased operation when Deshler died. *Id.* at 9:38-

5    9:39 a.m. In response, John stated that Deshler used many names. *Id.* at 9:43 a.m. John then

6    produced a letter from Deshler that was written on letterhead using the name "Lord & Carter Trust

7    and Trustee Services." *Id.* at 9:43-9:44 a.m. Kay added that Deshler's business card also used the

8    name "Lord & Carter Trust and Trustee Services." *Id.* at 9:44 a.m. John also stated that Deshler

9    sometimes used the name "Lord & Carter Professional Trust Services." *Id.* at 9:47 a.m.

10        Plaintiffs filed oppositions on May 3, 2017, ECF Nos. 20, 23, and the relevant Defendants

11    filed replies on May 9, 2017 and May 10, 2017, ECF Nos. 25, 26.

12        Because Deshler and Lord & Carter Trust and Trustee Services had not appeared and thus

13    had not consented to magistrate judge jurisdiction, the case was transferred to the undersigned

14    judge on May 17, 2017. *Id.* at 9:49 a.m; ECF Nos. 29, 31.

15        On September 19, 2017, the Court granted Wells Fargo's motion to dismiss with leave to

16    amend and denied Harris and Humprey's motion to dismiss. ECF No. 53.

17        At a settlement conference on October 11, 2017, Plaintiffs reached a settlement with Wells

18    Fargo. ECF No. 58. Plaintiffs later voluntarily dismissed Wells Fargo. ECF No. 63. On

19    November 1, 2017, Plaintiffs filed a notice stating that they would not be filing an amended

20    complaint but that they reserved the right to later file an amended complaint pursuant to Federal

21    Rule of Civil Procedure 15. ECF No. 64.

22        On November 2, 2017, Harris and Humphrey's attorney filed a motion to withdraw. ECF

23    No. 65. Harris and Humphrey's attorney represented that Harris and Humphrey intended to

24    proceed pro se. *Id.* On November 22, 2017, the Court granted the motion to withdraw, "on the

25    condition that [the attorney] deliver to Harris and Humphrey by November 29, 2017 the complete

26    case file, including any discovery requests that he has received." ECF No. 69 at 3. On November

28    Case No. 17-CV-01524-LHK
     ORDER DENYING WITHOUT PREJUDICE MOTION FOR DEFAULT JUDGMENT, GRANTING LEAVE TO
     AMEND

United States District Court
Northern District of California

United States District Court
Northern District of California

29, 2017, Harris and Humphrey's attorney filed a notice disclosing Harris and Humphrey's contact information and confirming that "a complete case file has been transferred to the possession of the pro se Defendants Harris and Humphrey, including by emailing to Defendants a copy of the Discovery Requests propounded by Plaintiffs on November 14, 2017." ECF No. 70.

On January 16, 2018, Plaintiffs filed a separate discovery dispute statement before Judge van Keulen in which Plaintiffs detailed their efforts to meet and confer with Harris and Humphrey to obtain responses to Plaintiffs' discovery requests. ECF No. 71.

On January 17, 2018, Plaintiffs filed a case management statement in which they again detailed Harris and Humphrey's failure to respond to discovery requests. ECF No. 73. On January 24, 2018, the Court issued a case management order in which the Court noted that Harris and Humphrey failed to appear at the case management conference, failed to file a case management conference statement, failed to answer the complaint, and failed to serve initial disclosures as ordered by the Court. ECF No. 77. As a result, the Court advised Plaintiffs that they may choose to seek entry of default with the Clerk's Office and, if the Clerk enters default, to file a motion for default judgment. The Court referred Plaintiffs to the Federal Pro Se Program for assistance with the default process. *Id.*

On January 25, 2018, Judge van Keulen granted Plaintiffs' motion to compel and ordered Harris and Humphrey to respond to certain interrogatories and requests for production by February 5, 2018. ECF No. 79. Harris and Humphrey apparently failed to respond. ECF No. 80.

On February 27, 2018, Plaintiffs filed a motion for entry of default. ECF No. 80. On February 28, 2018, the Clerk entered default as to Harris and Humphrey. ECF No. 82. On March 5, 2018, Plaintiffs filed the instant motion for default judgment. ECF No. 82 ("Mot."). On March 20, 2018, Plaintiffs filed a motion to shorten time. ECF No. 86. On April 3, 2018, the Court granted the motion to shorten time. ECF No. 92.

## II.   LEGAL STANDARD

Pursuant to Rule 55(b)(2), the court may enter a default judgment when the clerk, under

9

Rule 55(a), has previously entered the party's default. Fed. R. Civ. P. 55(b). "The district court's decision whether to enter a default judgment is a discretionary one." *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). Once the Clerk of Court enters default, all well-pleaded allegations regarding liability are taken as true, except with respect to damages. *See Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002) ("With respect to the determination of liability and the default judgment itself, the general rule is that well-pled allegations in the complaint regarding liability are deemed true."); *TeleVideo Sys. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987) ("[U]pon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true."); *Philip Morris USA v. Castworld Prods.*, 219 F.R.D. 494, 499 (C.D. Cal. 2003) ("[B]y defaulting, Defendant is deemed to have admitted the truth of Plaintiff's averments."). "In applying this discretionary standard, default judgments are more often granted than denied." *Philip Morris*, 219 F.R.D. at 498.

"Factors which may be considered by courts in exercising discretion as to the entry of a default judgment include: (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits." *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

## III.    DISCUSSION

### A.    Jurisdiction

"When entry of judgment is sought against a party who has failed to plead or otherwise defend, a district court has an affirmative duty to look into its jurisdiction over both the subject matter and the parties. A judgment entered without personal jurisdiction over the parties is void." *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999) (citations omitted). The Court thus begins by evaluating subject matter jurisdiction and personal jurisdiction.

Case No. 17-CV-01524-LHK
ORDER DENYING WITHOUT PREJUDICE MOTION FOR DEFAULT JUDGMENT, GRANTING LEAVE TO AMEND

United States District Court
Northern District of California

1   **1.  Subject Matter Jurisdiction**

2       The Court finds that it has both diversity and federal question subject matter jurisdiction

3   over this case.  With respect to diversity jurisdiction under 28 U.S.C. § 1332, both Plaintiffs are

4   citizens of California, all Defendants are citizens of Washington state, and the amount in

5   controversy exceeds $75,000.  Compl. ¶¶ 1-5, 9.  With respect to federal question jurisdiction

6   under 28 U.S.C. § 1331, Plaintiffs' complaint raises a federal question because it asserts a civil

7   RICO cause of action.  *See* 18 U.S.C. § 1964.

8   **2.  Personal Jurisdiction**

9       To determine the propriety of asserting personal jurisdiction over a defendant, the Court

10  examines whether such jurisdiction is permitted by the applicable state's long-arm statute and

11  comports with the demands of federal due process.  *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell &*

12  *Clements, Ltd.*, 328 F.3d 1122, 1128-29 (9th Cir. 2003).  California's long-arm statute, Cal. Civ.

13  Proc. Code § 410.10, is coextensive with federal due process requirements, and therefore the

14  jurisdictional analyses under state law and federal due process are the same.  *See* Cal. Civ. Proc.

15  Code § 410.10 ("[A] court of this state may exercise jurisdiction on any basis not inconsistent with

16  the Constitution of this state or of the United States."); *Mavrix Photo, Inc. v. Brand Techs., Inc.*,

17  647 F.3d 1218, 1223 (9th Cir. 2011).  For a court to exercise personal jurisdiction over a defendant

18  consistent with due process, that defendant must have "certain minimum contacts" with the

19  relevant forum "such that the maintenance of the suit does not offend 'traditional notions of fair

20  play and substantial justice.'"  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting

21  *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).  In addition, "the defendant's 'conduct and

22  connection with the forum State' must be such that the defendant 'should reasonably anticipate

23  being haled into court there.'"  *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990) (quoting

24  *World-Wide Volkwagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

25      A court may exercise either general or specific jurisdiction over a defendant.  *Ziegler v.*

26  *Indian River Cty.*, 64 F.3d 470, 473 (9th Cir. 1995).  General jurisdiction exists where a defendant

27

28  Case No. 17-CV-01524-LHK
    ORDER DENYING WITHOUT PREJUDICE MOTION FOR DEFAULT JUDGMENT, GRANTING LEAVE TO
    AMEND

United States District Court
Northern District of California

11

1    is physically present or where a defendant's activities in the state are "continuous and systematic"

2    such that the contacts approximate physical presence in the forum state.  *See Schwarzenegger v.*

3    *Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004) (citation omitted).  If general

4    jurisdiction is inappropriate, a court may still exercise specific jurisdiction if the defendant's

5    "contacts with the forum give rise to the cause of action before the court."  *Doe v. Unocal Corp.*,

6    248 F.3d 915, 923 (9th Cir. 2001).

### a.  General Jurisdiction

8         The Court may exercise general jurisdiction over a defendant who is domiciled in the

9    forum state.  *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998).

10   Additionally, general jurisdiction over a nonresident exists where a defendant has "continuous and

11   systematic" contacts with the forum state such that the defendant may be "haled into court in the

12   forum state to answer for any of its activities anywhere in the world."  *Schwarzenegger,* 374 F.3d

13   at 801.  Plaintiffs do not allege that either Harris or Humphrey is domiciled in California.  Nor do

14   Plaintiffs allege that Harris or Humphrey has the level of continuous and systematic contacts with

15   California that would support a finding of general jurisdiction.  Accordingly, Harris and

16   Humphrey are not subject to this Court's general jurisdiction.  The Court next turns to specific

17   jurisdiction.

### b.  Specific Jurisdiction

19        Where general jurisdiction is inappropriate, a court may still exercise specific jurisdiction

20   where the nonresident defendant's "contacts with the forum give rise to the cause of action before

21   the court."  *Doe*, 248 F.3d at 923.  "The inquiry whether a forum State may assert specific

22   jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the

23   forum, and the litigation." *Axiom Foods*, 874 F.3d at 1068 (quoting *Walden v. Fiore*, 134 S. Ct.

24   1115, 1121 (2014)).  The Ninth Circuit recently explained that "[t]wo principles animate the

25   defendant-focused inquiry."  *Id.* at 1068 (internal quotation marks omitted).  "First, the

26   relationship between the nonresident defendant, the forum, and the litigation 'must arise out of

27

28   Case No. 17-CV-01524-LHK
     ORDER DENYING WITHOUT PREJUDICE MOTION FOR DEFAULT JUDGMENT, GRANTING LEAVE TO
     AMEND

United States District Court
Northern District of California

12

contacts that the defendant himself creates with the forum state." *Id.* (quoting *Walden*, 134 S. Ct. at 1122). "Second, the minimum contacts analysis examines 'the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id.* (quoting *Walden*, 134 S. Ct. at 1122). "It follows that 'a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction.'" *Id.* (quoting *Walden*, 134 S. Ct. at 1123).

"While 'a single act can support jurisdiction'" in a tort case, "the act must first 'create[] a substantial connection with the forum.'" *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 n.18 (1985) (alteration in original) (internal quotation marks omitted)). "Thus, a 'mere injury to a forum resident is not a sufficient connection to the forum.'" *Picot v. Weston*, 780 F.3d 1206, 1214 (quoting *Walden*, 134 S. Ct. at 1125). "Rather, 'an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State.'" *Id.* (quoting *Walden*, 134 S. Ct. at 1125).

To determine whether a defendant's contacts with the forum state are sufficient to establish specific jurisdiction, the Ninth Circuit employs a three-part test:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Morrill v. Scott Financial Corp.*, 873 F.3d 1136, 1142 (9th Cir. 2017) (quoting *Schwarzenegger*, 374 F.3d at 802). The Court addresses the three prongs in turn.

### i.    Purposeful Direction

For causes of action sounding in tort, like those in the instant case, the Court applies the purposeful direction test, rather than the purposeful availment test, which generally applies to

13

United States District Court
Northern District of California

1   claims arising from a contract.  *See Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064,

2   1069 (9th Cir. 2017) ("Where, as here, a case sounds in tort, we employ the purposeful direction

3   test."); *Morrill*, 873 F.3d at 1142 ("We generally apply the purposeful availment test when the

4   underlying claims arise from a contract, and the purposeful direction test when they arise from

5   alleged tortious conduct.").  The purposeful direction test, "often referred to as the 'effects' test,

6   derives from *Calder v. Jones*, 465 U.S. 783 (1984)."  *Axiom Foods*, 874 F.3d at 1069.  To satisfy

7   the *Calder* purposeful direction test, "[t]he defendant must have (1) committed an intentional act,

8   (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be

9   suffered in the forum state."  *Id.* (internal quotation marks omitted).

### a.  Intentional Act

11   Plaintiffs allege that Harris, who served as Deshler's assistant, traveled to San Jose,

12   California with Deshler for client meetings and seminars in June 2012.  Compl. ¶¶ 35-36.  During

13   this trip, Harris and Deshler met with Plaintiffs in Plaintiffs' home in Campbell, California.  *Id.*

14   ¶ 36.  During this meeting, Harris and Deshler allegedly admitted to Plaintiffs "that Deshler had

15   taken the money from the Blue Mountain Trust Account, without the permission of the Gabors as

16   trustees, and reinvested the money in properties owned by the Paul Revere Financial Trust," *id.*, of

17   which Harris was a trustee, *id.* ¶ 30.  When Plaintiffs demanded that their money be returned to the

18   Blue Mountain Trust, Harris and Deshler told Plaintiffs that Plaintiffs would get their money back

19   with interest in 30 years.  *Id.* ¶ 38.  Plaintiffs also allege that Harris sent them a letter in October

20   2012 informing them of Deshler's death.  *Id.* ¶ 46.  Finally, Plaintiffs allege that Harris serves as

21   trustee on many of the trusts into which Deshler transferred Plaintiffs' assets.  *Id.* ¶¶ 30-34.

22   Plaintiffs allege that Humphrey, along with Harris, is a trustee of many of the trusts into

23   which Deshler transferred Plaintiffs' assets.  *Id.* ¶¶ 31-34.  Plaintiffs allege that one of these trusts,

24   the Home Sanctuary Trust, made an unsecured loan to Christopher and Carlee Barnes, who live in

25   Long Beach, California.  *Id.* ¶ 31.  However, Plaintiffs do not allege whether it was Harris,

26   Humphrey, or someone else, who decided that the Home Sanctuary Trust should lend money to

27

28   Case No. 17-CV-01524-LHK
ORDER DENYING WITHOUT PREJUDICE MOTION FOR DEFAULT JUDGMENT, GRANTING LEAVE TO
AMEND

14

United States District Court
Northern District of California

the Barneses.

Traveling to California, meeting with Plaintiffs, sending a letter to Plaintiffs, and serving as trustees are all "unquestionably . . . intentional act[s], so the first prong of the test is satisfied." *Axiom Foods*, 874 F.3d at 1069; *see also Picot v. Weston*, 780 F.3d 1206, 1214 (9th Cir. 2015) (stating that speaking with a potential client was an intentional act).  The Court next considers whether Harris and Humphrey expressly aimed these acts at California.

### b.  Express Aiming

The second prong of the purposeful direction inquiry is whether the defendant expressly aimed her act at the forum state.  *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002).  The "express aiming" analysis "depends, to a significant degree, on the specific type of tort or other wrongful conduct at issue."  *Picot*, 780 F.3d at 1214 (quoting *Schwarzenegger,* 374 F.3d at 807).  To be satisfied, the "express aiming" inquiry requires "something more" than "a foreign act with foreseeable effects in the forum state."  *A-Z Sporting,* 704 F.3d at 675 (citing *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.,* 223 F.3d 1082, 1087 (9th Cir. 2000)).  In other words, the Court must focus on the "defendant's 'own contacts' with the forum, not . . . the defendant's knowledge of a plaintiff's connections to a forum."  *Axiom Foods*, 874 at 1070 (quoting *Walden*, 134 S. Ct. at 1124-25).

The Ninth Circuit's decision in *Picot* is instructive.  In *Picot*, 780 F.3d 1206, Weston, a Michigan resident, worked with Picot, a California resident, to develop a technology related to hydrogen fuel cells.  *Id.* at 1209.  During the development of the technology, "Weston left his Michigan office to travel to California" on two occasions.  *Id.* at 1210.  First, Weston spent two weeks in southern California to set up a demonstration for a potential client.  Second, Weston traveled to Sacramento to help with another demonstration.  *Id.*  Picot and another business partner eventually sold the technology to a third party.  Proceeds from the sale were "paid into two pass-through trusts, one in Wyoming and one in Australia."  *Id.*  A dispute between Picot and Weston over the proceeds ensued, and Picot brought suit against Weston in California.  *Id.*  One of the

15

Case No. 17-CV-01524-LHK
ORDER DENYING WITHOUT PREJUDICE MOTION FOR DEFAULT JUDGMENT, GRANTING LEAVE TO AMEND

1   claims was for tortious interference with the sales contract.  The district court dismissed after

2   concluding that it did not have personal jurisdiction over Weston.  *Id.* at 1210-11.

3        The Ninth Circuit affirmed.  In assessing the "express aiming" prong of the *Calder* effects

4   test, the Ninth Circuit focused on whether Weston's allegedly tortious conduct connected Weston

5   to California "in a way sufficient to support the assertion of personal jurisdiction over him." *Id.* at

6   1214-15.  The Ninth Circuit found that "Weston's allegedly tortious conduct consists of making

7   statements to Coats (an Ohio resident) that caused HMR (a Delaware corporation with offices in

8   Ohio) to cease making payments into two trusts (in Wyoming and Australia).  Weston did all this

9   from his residence in Michigan, without entering California, contacting any person in California,

10  or otherwise reaching out to California." *Id.* at 1215.  Notably, the Ninth Circuit did not consider

11  Weston's two trips to California as part of the express aiming analysis, because these trips were

12  not part of Weston's "challenged conduct." *Id.*  "Moreover, as in *Walden*, Picot's injury, an

13  inability to access out-of-state funds, is not tethered to California in any meaningful way.  Rather,

14  his injury is entirely personal to him and would follow him wherever he might choose to live or

15  travel.  The effects of Weston's actions are therefore 'not connected to the forum State in a way

16  that makes those effects a proper basis for jurisdiction.'" *Id.* (quoting *Walden*, 134 S. Ct. at 1125).

17       Here, like in *Picot*, the allegations in the complaint do not establish that Harris and

18  Humphrey expressly aimed their challenged conduct at California.  Most of the challenged

19  conduct that underpins Plaintiffs' causes of action is alleged to have been committed by Deshler,

20  not Harris or Humphrey.  To the extent that Plaintiffs allege actions by Harris or Humphrey, those

21  actions either (1) do not constitute the challenged conduct underpinning the causes of action, or (2)

22  are not expressly aimed at California.

23       First, although Plaintiffs allege that Harris met with Plaintiffs and Deshler at Plaintiffs'

24  home in California in 2012, Plaintiffs do not contend that the meeting itself or anything Harris

25  allegedly said at the meeting form the basis for any of the causes of action in the complaint.  For

26  example, although Harris and Deshler disclosed during the meeting in California that Deshler had

28  Case No. 17-CV-01524-LHK
    ORDER DENYING WITHOUT PREJUDICE MOTION FOR DEFAULT JUDGMENT, GRANTING LEAVE TO
    AMEND

United States District Court
Northern District of California

1    taken the money from the Blue Mountain Trust and reinvested it in properties owned by the Paul

2    Revere Financial Trust, Deshler's actual transfer of the money allegedly occurred in Washington

3    in 2010.  Compl. ¶¶ 21, 26-29, 36.  Similarly, Plaintiffs do not allege that anything Harris said at

4    the 2012 California meeting induced Plaintiffs' reliance or misled Plaintiffs as to the location of

5    their money.  Thus, Harris's participation in the 2012 California meeting with Plaintiffs is

6    analogous to Weston's business trips to California in *Picot*.  In both cases, the travel to California

7    and activities there generally relate to the subject of the case, but the actions in California are not

8    the "challenged conduct" that underpins the causes of action.  *See Picot*, 780 F.3d at 1214-15; *see*

9    *also Gemcap Lending I, LLC v. Crop USA Ins. Agency, Inc.*, No. CV 13-5504 SJO (MANx), 2014

10   WL 12589333, at *5 (C.D. Cal. Feb. 14, 2014) ("Plaintiff does not allege that the business trips

11   are related to the issues in this case, as they must before specific jurisdiction attaches." (citation

12   omitted)).  As such, the 2012 California meeting does not show that Harris expressly aimed her

13   challenged conduct at California.  The same reasoning applies to the letter that Harris sent

14   Plaintiffs informing them of Deshler's death.  This letter does not support any of the causes of

15   action, and so it does not show that Harris expressly aimed her challenged conduct at California.

16   *See Morrill*, 873 F.3d at 1144-45 ("Any links to Arizona, which included Defendants'

17   communications with Plaintiffs by telephone and email about the Tharaldson Litigation, occurred

18   only because it happened to be where Plaintiffs resided."); *Professional's Choice Sports Medicine*

19   *Prods., Inc. v. Hegeman*, No. 15-cv-2505-BAS(WVG), 2016 WL 1450704, at *4 (S.D. Cal. April

20   12, 2016) ("[A] plaintiff must point to contacts which demonstrate that the defendant 'expressly

21   aimed its *tortious conduct* at the forum.'" (emphasis altered)); *Gemcap Lending I*, 2014 WL

22   12589333 at *6 ("Purposeful direction occurs where a party's 'intentional, and *allegedly tortious*,

23   actions [a]re expressly aimed' at the forum state." (quoting *Calder*, 465 U.S. at 789) (emphasis

24   added)).

25        Plaintiffs also contend that the Home Sanctuary Trust's loan to Long Beach residents

26   Christopher and Carlee Barnes shows that Harris and Humphrey expressly aimed their activities at

27                                             17

28   Case No. 17-CV-01524-LHK
     ORDER DENYING WITHOUT PREJUDICE MOTION FOR DEFAULT JUDGMENT, GRANTING LEAVE TO
     AMEND

California.  Mot. at 16.  As an initial matter, it is not clear whether the Home Sanctuary Trust's loan constitutes challenged conduct, as the relationship between the loan and Plaintiffs' causes of action is not explained in the complaint or the motion for default judgment.  However, even assuming that the loan qualifies as allegedly tortious conduct, neither the allegations in the complaint related to the loan nor the declaration filed by Bryan Barnes[1] shows that Harris or Humphrey expressly aimed any relevant conduct at California for two reasons.

First, there is no allegation that Harris or Humphrey reached into California to seek out the Barneses as borrowers.  Specifically, the complaint alleges that Harris and Humphrey are trustees of the Home Sanctuary Trust and that "[t]he Home Sanctuary Trust later made an unsecured loan to Christopher and Carlee Barnes who live in Long Beach, California."  Compl. ¶ 31.  Bryan Barnes's declaration states that his company, LA Pool Guys, "was in need of financing in 2011 after unsuccessfully trying to get a loan from traditional banks."  ECF No. 91 at 2.  LA Pool Guys then "sought out private financing" and "established a loan from Home Sanctuary Trust dated October 11, 2011."  *Id.*  LA Pool Guys made monthly payments of $816.70 between November 7, 2011 and February 7, 2018.  *Id.*  Plaintiffs do not allege, and Bryan Barnes does not state, that Harris or Humphrey ever traveled to California in relation to the loan or that Harris or Humphrey sought out the Barneses as borrowers.  If anything, Bryan Barnes's statement that LA Pool Guys "sought out private financing" suggests the opposite—that Barnes reached out to the Home Sanctuary Trust in Washington to obtain the loan.  Moreover, as the Ninth Circuit explained in *Axiom Foods*, even if Harris or Humphrey individually targeted the Barneses as known California residents, such targeting "will not, on its own, support the exercise of specific jurisdiction." *Axiom Foods*, 874 F.3d at 1070.

Second, neither the allegations in the complaint nor Bryan Barnes's declaration specifically ties either Harris or Humphrey, as distinct from the Home Sanctuary Trust, to the loan.  *See* Compl. ¶ 31; ECF No. 91.  Without any allegations about the role that either Harris or Humphrey

---

[1] Presumably Bryan Barnes and Christopher Barnes are the same person.

Case No. 17-CV-01524-LHK
ORDER DENYING WITHOUT PREJUDICE MOTION FOR DEFAULT JUDGMENT, GRANTING LEAVE TO AMEND

United States District Court
Northern District of California

1  played in establishing the loan, the fact that the Home Sanctuary Trust made a loan to California

2  residents does not show that either Harris or Humphrey expressly aimed challenged conduct at

3  California.

4  　　　Plaintiffs' other allegations related to Harris's and Humphrey's service as trustees of

5  various trusts that allegedly received Plaintiffs' money are more closely connected to Plaintiffs'

6  causes of action, in that Plaintiffs allege that Harris and Humphrey misrepresented and concealed

7  the activities of the various trusts in order to misappropriate Plaintiffs' assets.  Compl. ¶¶ 30-34,

8  42, 48, 51, 58, 62, 69.  However, aside from the loan to the Barneses, the only link between the

9  trusts and California is that the trusts' alleged unauthorized use of Plaintiffs' assets injured

10  Plaintiffs, who live in California.  The foreseeability of harm in the forum state, even when

11  combined with knowledge of Plaintiffs' connection to the forum state, is not enough to confer

12  personal jurisdiction.  *See Axiom Foods*, 874 F.3d at 1069-70 (citing *Walden*, 134 S. Ct. at 1124-

13  25).

14  　　　Moreover, the Ninth Circuit specifically found in *Picot* that an analogous harm—an

15  inability to access funds in an out-of-state trust—"is not tethered to California in any meaningful

16  way.  Rather, [Plaintiffs'] injury is entirely personal to [them] and would follow [them] wherever

17  [they] might choose to live or travel."  *Picot*, 780 F.3d at 1215.  Similarly here, actions by Harris

18  and Humphrey in Washington that caused Plaintiffs' inability to access the funds of the Blue

19  Mountain Trust, which is based in Washington, *see* ECF No. 83-1 at 9, ¶ 2.7, do not show that

20  Harris or Humphrey expressly aimed conduct at California.

21  　　　Because Plaintiffs have not established the second prong of the purposeful direction test,

22  the Court need not address the third prong, *Picot*, 780 F.3d at 1215 n.4 (citing *Schwarzenegger*,

23  374 F.3d at 807 n.1), the other prongs of the specific jurisdiction test more broadly, or the *Eitel*

24  factors governing whether default judgment is appropriate.  Because Plaintiffs have failed to

25  establish that the Court has personal jurisdiction over Harris and Humphrey, the Court DENIES

26  the motion for default judgment.  *See In re Tuli*, 172 F.3d at 172 F.3d at 712 ("A judgment entered

27

28  Case No. 17-CV-01524-LHK
ORDER DENYING WITHOUT PREJUDICE MOTION FOR DEFAULT JUDGMENT, GRANTING LEAVE TO
AMEND

19

United States District Court
Northern District of California

1   without personal jurisdiction over the parties is void."); *Pacific Atlantic Trading Co. v. M/V Main*

2   *Exp.*, 758 F.2d 1325, 1331 (9th Cir. 1985) (reversing and remanding with instructions to set aside

3   default judgment as void for lack of personal jurisdiction).

4   **B.    Leave to Amend**

5           In their motion for default judgment, Plaintiffs request leave to amend if the Court denies

6   the motion for default judgment. *See* Mot. at 16-17. Because the Court *sua sponte* raised the

7   personal jurisdiction issue as part of its analysis of the motion for default judgment, the Court

8   finds that Plaintiffs should be allowed leave to amend so that Plaintiffs may plead additional facts

9   to attempt to establish personal jurisdiction over Harris and Humphrey. *See In re Tuli*, 172 F.3d at

10  713-14 (remanding for district court to allow the plaintiff the opportunity to demonstrate personal

11  jurisdiction after the district court *sua sponte* raised personal jurisdiction in analyzing a default

12  judgment motion). Although Harris and Humphrey previously challenged the complaint on

13  personal jurisdiction grounds, Harris and Humphrey argued estoppel, rather than arguing the

14  merits of the personal jurisdiction issue. *See* ECF No. 12. Because Harris and Humphrey did not

15  argue the merits of whether they were subject to the Court's personal jurisdiction and because the

16  Court denied their motion, Plaintiffs did not previously have reason to amend their complaint to

17  supplement their jurisdictional allegations. As such, Plaintiffs may amend to attempt to establish

18  personal jurisdiction over Harris and Humphrey. In the alternative, Plaintiffs may move to

19  transfer the case to the appropriate district in Washington, where Harris and Humphrey would be

20  subject to general personal jurisdiction.

21          In addition, although the Court does not reach the *Eitel* factors in the instant order, the

22  Court notes for the benefit of Plaintiffs, who are proceeding pro se, that the complaint appears

23  substantively deficient in several respects. First, Plaintiffs must plead facts to state a claim for

24  each cause of action alleged against each defendant, yet the complaint does not allege actions by

25  Harris or Humphrey that would support some of the causes of action alleged against them. For

26  example, Plaintiffs allege that "Harris and Humphrey committed promissory fraud against

27

28  Case No. 17-CV-01524-LHK
    ORDER DENYING WITHOUT PREJUDICE MOTION FOR DEFAULT JUDGMENT, GRANTING LEAVE TO
    AMEND

United States District Court
Northern District of California

20

1    Plaintiffs because Defendants had no intention of protecting Plaintiffs' assets when they induced

2    Plaintiffs into depositing their assets into a trust."  Compl. ¶ 54.  However, the complaint contains

3    no allegations that either Harris or Humphrey had anything to do with inducing Plaintiffs to

4    deposit their assets into the Blue Mountain Trust.  Plaintiffs are thus granted leave to amend to

5    allege additional facts that would support Harris's or Humphrey's liability for any of the currently

6    pled causes of action.

7         Second, the current complaint alleges that Deshler was responsible for most of the conduct

8    underpinning the causes of action, yet any claims against Deshler are untimely under California's

9    statute of limitations governing actions against deceased persons, Cal. Code Civ. P. § 366.2(a),

10   which provides a one-year limitations period commencing on the date of death.  Instead, Plaintiffs

11   should have named Deshler's estate as the proper defendant in this action.  *See* Witkin, Trusts,

12   Summary of California Law § 141 (11th ed.) ("The liability of the trustee for improperly handling

13   trust property will survive the trustee's death and may be made the basis of a claim against his or

14   her estate." (citing *Fields v. Michael*, 205 P.2d 402 (Cal. Ct. App. 1949))).  Thus, Plaintiffs are

15   granted leave to amend to name Deshler's estate in place of Deshler and re-attempt appropriate

16   service on Deshler's estate.

17        Third, Plaintiffs are granted leave to amend to add factual allegations to the complaint that

18   would support any equitable tolling arguments that Plaintiffs may wish to make related to statute

19   of limitations issues.

20        Plaintiffs also request leave to (1) add Humphrey to the professional negligence and breach

21   of fiduciary duty claims, and (2) add aiding and abetting fraud claims where appropriate.  *See* Mot.

22   at 17.  Allowing leave to amend to fix jurisdictional deficiencies and substantive deficiencies in

23   existing claims is appropriate after the denial of a motion for default judgment, particularly when

24   no previous motion to dismiss addressed the sufficiency of Plaintiffs' claims.  *See, e.g.*, *In re Tuli*,

25   172 F.3d at 713-14 (remanding for plaintiff to cure jurisdictional deficiency); *Golden West Veg,*

26   *Inc. v. Bartley*, No. 16-CV-3718-LHK, 2017 WL 386254, at *6 (N.D. Cal. Jan. 27, 2017)

27

28   Case No. 17-CV-01524-LHK
     ORDER DENYING WITHOUT PREJUDICE MOTION FOR DEFAULT JUDGMENT, GRANTING LEAVE TO
     AMEND

United States District Court
Northern District of California

21

United States District Court
Northern District of California

1  (granting leave to amend the complaint after determining on a motion for default judgment that the

2  plaintiff had not adequately alleged all the elements of a cause of action).  Thus, Plaintiffs are

3  granted leave to amend to add Humphrey to the professional negligence and breach of fiduciary

4  claims and to add aiding and abetting fraud claims where appropriate.

5      Finally, the Court notes issues that Plaintiffs should consider.  The Court is not opining on

6  these issues.  First, because the allegations in this case involve multiple trusts, Plaintiffs should

7  consider whether they should assert some causes of action in their capacity as trustees of the Blue

8  Mountain Trust.  *See generally* Cal. Prob. Code § 16420(a) ("If a trustee commits a breach of trust

9  . . . a beneficiary or cotrustee of the trust may commence a proceeding for any of the following

10  purposes that is appropriate . . ."); 13 Witkin, Summary of California Law, Trusts § 63 (11th ed.)

11  ("One cotrustee may, on behalf of the beneficiary, maintain an action against another cotrustee

12  guilty of a breach or threatened breach of the trust.").  Plaintiffs should also consider whether they

13  should bring some causes of action as beneficiaries, if they are in fact beneficiaries, of the Blue

14  Mountain Trust.  The Court notes that it is not clear from Plaintiffs' trust documents whether

15  Plaintiffs are in fact the beneficiaries.  In addition, although it may be appropriate for Plaintiffs to

16  assert some causes of action in their individual capacities, such as their cause of action for elder

17  abuse, Plaintiffs should consider whether other causes of action, for example, the seventh cause of

18  action for conversion, should be asserted in their capacities as trustees for the Blue Mountain

19  Trust.  Similarly, because Plaintiffs allege that their assets have been transferred to other trusts for

20  which Harris and Humphrey serve as trustees, Plaintiffs should consider whether Harris and

21  Humphrey should be sued in their capacity as trustees, and if so, for which causes of action.

22      Because these issues are complicated, the Court finds that this case would benefit from the

23  appointment of pro bono counsel.  Accordingly, the Court refers the case to Mr. Kevin Knestrick

24  of the Federal Pro Se Program for identification of pro bono counsel.  Plaintiffs shall continue to

25  proceed pro se unless and until pro bono counsel is identified and appointed.

26  **IV.    CONCLUSION**

27

28

Case No. 17-CV-01524-LHK
ORDER DENYING WITHOUT PREJUDICE MOTION FOR DEFAULT JUDGMENT, GRANTING LEAVE TO
AMEND

1    For the foregoing reasons, the motion for default judgment is DENIED for lack of personal

2    jurisdiction.  The Court GRANTS Plaintiffs leave to amend to cure the deficiencies identified in

3    this order.  Specifically, Plaintiffs may (1) allege additional facts to establish personal jurisdiction

4    over Harris and Humphrey; (2) allege additional facts to support the causes of action already

5    alleged in the original complaint; (3) name Deshler's estate in the place of Deshler, who is

6    deceased, and to properly serve Deshler's estate; (4) add allegations related to any equitable

7    tolling argument Plaintiffs may wish to make; (5) add Humphrey to the professional negligence

8    and breach of fiduciary claims; (6) add aiding and abetting fraud claims; and (7) if appropriate,

9    allege causes of action in Plaintiffs' capacity as trustees or allege causes of action against Harris or

10    Humphrey in their capacity as trustees.  Plaintiffs may not add other new causes of action or add

11    any other new parties without the permission of the Court.

12    The Court also VACATES the default previously entered against Harris and Humphrey,

13    ECF No. 82.  If Plaintiffs choose to file an amended complaint, such an amended complaint must

14    be filed within 45 days of the date of this order.  If any defendants again default, Plaintiffs may

15    then file a renewed motion for entry of default, followed by a renewed motion for default

16    judgment.

17    **IT IS SO ORDERED.**

18

19    Dated: June 7, 2018

20    _Lucy H. Koh_
     _____

21    LUCY H. KOH
     United States District Judge

22

23

24

25

26

27                                         23

28    Case No. 17-CV-01524-LHK
     ORDER DENYING WITHOUT PREJUDICE MOTION FOR DEFAULT JUDGMENT, GRANTING LEAVE TO
     AMEND

*United States District Court*
*Northern District of California*